UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

DELTA FUEL COMPANY, LLC                                    PLAINTIFF

VS.                              CIVIL ACTION NO. 3:25-CV-410-TSL-LGI

DELTA UTILITIES, LLC, DELTA
UTILITIES MS, LLC and JOHN
DOES 1-10                                                  DEFENDANTS

MEMORANDUM OPINION AND ORDER

Delta Fuel Company, LLC (Delta Fuel), a distributor of

petroleum products and derivatives in Mississippi, Louisiana and

Texas, has brought this action against Delta Utilities, LLC and

Delta Utilities MS, LLC (collectively Delta Utilities)[1], a

natural gas utility operator in Louisiana and Mississippi,

alleging claims of federal trademark infringement under the

Lanham Act, 15 U.S.C. § 1051 et seq., and state law unfair

competition under Mississippi Code Annotated § 75-25-4.  The

case is presently before the court on Delta Fuel's motion for a

preliminary injunction, by which it seeks an order directing

that "during the pendency of this litigation, Delta Utilities,

and their agents, officers, employees, attorneys, and all

parties who are in active concert or participation with Delta

---

[1]    According to the answer, "Effective January 10, 2025 and
May 29, 2025, the entity Delta Utilities MS, LLC changed its
name to Delta Mississippi Gas Company, LLC and the entity Delta
Utilities, LLC changed its name to Magnolia Gas Company, LLC,
respectively," but each continues to do business as "Delta
Utilities."

Utilities, are enjoined from advertising, marketing, or promoting its natural gas distribution business under the DELTA UTILITIES marks." Delta Utilities has responded in opposition to the motion, and the court, having considered the memoranda of authorities, together with attachments, submitted by the parties, concludes the motion should be denied.[2]

BACKGROUND

Delta Fuel: According to the affidavit of Adam Vegas, the current president and CEO of Delta Fuel, since Delta Fuel's founding in 1977, the company has distributed "a range of petroleum products, including compressed gases (such as natural gas, propane, liquified petroleum gas (LPG)), fuels (such as gasoline, diesel, and aviation fuels), lubricating and hydraulic oils, and chemicals" to "a variety of customers and industries,

---

[2] While Delta Fuel has requested oral argument on its motion, the court is not persuaded that additional argument is necessary as the parties have adequately presented their positions in their briefing; and neither party has requested an evidentiary hearing or suggested that it has additional evidence to submit in support of or opposition to the motion. See Kaepa, Inc. v. Achilles Corp., 76 F.3d 624, 628 (5th Cir. 1996) (explaining that, in the absence of a factual dispute, "no oral hearing is required; ... the parties need only be given ample opportunity to present their respective views of the legal issues involved." (citation modified)); Amicus Communications, L.P. v. Hewlett-Packard Co., Inc., No. CIV.A.SA-98CA1176PMA, 1999 WL 495921, at *3 (W.D. Tex. June 11, 1999) ("An evidentiary hearing is not always required before a court denies a preliminary injunction. ... The basic question is whether the hearing will add anything material to the Court's consideration of the case.").

2

including agriculture, construction, energy, and residential."
The company was originally founded in Ferriday, Louisiana, but
relocated to Natchez, Mississippi in 2021.  It primarily serves
customers in Mississippi, Louisiana and Texas markets.

Since its inception, Delta Fuel has marketed its products
and distribution services using the DELTA FUEL® word mark,[3] which
it registered with United States Patent and Trademark Office
(USPTO) on the principal register[4] in March 2016, for goods

---

[3]    There are different categories of marks:  A "word mark"
refers to a mark comprised only of words; a "design mark" refers
to a mark comprised of symbols; and a "composite mark" refers to
a mark that contains both words and symbols in a distinct
manner.  Alliance for Good Gov't v. Coalition for Better Gov't,
901 F.3d 498, 503 (5th Cir. 2018) (citations modified).

[4]    The Lanham Act "establishes a system of federal trademark
registration."  USPTO v. Booking.com B. V., 591 U.S. 549, 551,
140 S. Ct. 2298, 207 L. Ed. 2d 738 (2020).  Under the Act, there
are two types of registration with the USTPO:  the principal
register and the supplemental register.  Oxendine v. Blockline
Bullies LLC, No. 2:24-CV-00740, 2025 WL 55279, at *6 (W.D. La.
Jan. 9, 2025).  Only marks that the USPTO deems "distinctive"
qualify for registration on the principal register.  See Future
Proof Brands, L.L.C. v. Molson Coors Beverage Co., 982 F.3d 280,
290 (5th Cir. 2020); see also infra pp. 14-17 (discussing
distinctiveness).  Among the advantages of registration on the
principal register is that it constitutes prima facie evidence
of the registrant's ownership and exclusive right to use of the
mark; registration creates a presumption (rebuttable) that the
registered mark is valid.  See Amazing Spaces, Inc. v. Metro
Mini Storage, 608 F.3d 225, 237 (5th Cir. 2010) (citing Lanham
Act §§ 7(b) & 33(a), 15 U.S.C. §§ 1057(b) & 1115(a)).  That is
not true for supplemental registrations.  See George & Co. LLC
v. Imagination Entm't Ltd., 575 F.3d 383, 391 n.8, 91 U.S.P.Q.2d
1786 (4th Cir. 2009) ("[U]nlike principal registration,
supplemental registration is not prima facie evidence of the
validity of the registered mark, of ownership of the mark, or of

3

described as "[p]etroleum products and derivatives, namely gasoline, diesel fuel, liquid petroleum gas, propane, lubricating oils, hydraulic oils, and chemicals," and for services described as "[s]torage, distribution, and transportation of petroleum products and derivatives" of the aforementioned products.

In 2019, Delta Fuel began marketing its products and distribution services with the composite mark:  In January 2024, however, plaintiff began marketing all of its products and services collectively under the DELTA360™ word and the composite mark:  Notwithstanding this change, Delta Fuel has continued to use the DELTA FUEL® word mark and the composite mark  for its fuel division.

Delta Utilities: As set out in the affidavit of Delta Utilities CEO Tim Poche, Delta Utilities is a natural gas provider in Louisiana and Mississippi. It is the primary natural gas provider for thirty-one of Louisiana's sixty-four parishes, mostly in south Louisiana, and thirty-six of Mississippi's eighty-two counties, mostly in central/south Mississippi.

---

the registrant's exclusive right to use the registered mark in commerce.").

In early 2023, Bernard Capital Partners, LP (BCP), a Baton Rouge private equity management group, was interested in forming a new natural gas utility company to serve residents of Louisiana and Mississippi.  Toward that end, the company began negotiations to purchase Entergy's distribution operations in Orleans and East Baton Rouge parishes.  In February 2023, Entergy prepared a Notice of Proposed Sale regarding the proposed transaction, which it denominated, "Project Delta."

In September 2023, BCP established "Delta States Utilities," and on October 30, 2023, the company announced its agreement to purchase Entergy's Louisiana natural gas distribution operations in Orleans and East Baton Rouge Parishes.  Five months later, in February 2024, Delta Utilities announced an agreement to purchase acquire all of CenterPoint Energy's natural gas distribution operations in Louisiana and Mississippi.  Both sales were finalized in 2025, after the necessary regulatory approvals were obtained, and on April 1, Delta Utilities acquired CenterPoint's natural gas operations in Louisiana and Mississippi; on July 1, it formally acquired Entergy's natural gas distribution operations in East Baton Rouge Parish and New Orleans.  With these acquisitions, Delta Utilities now provides natural gas utility services to approximately 600,000 customers in Mississippi and Louisiana.

Sarah Porteous, Delta Utilities' Vice President for Communications, explains in her affidavit that BCP decided to retain "Delta" from "Project Delta"'s working title and incorporate it in the name of the new utility to pay homage to "the two geographical and cultural regions that would ultimately be encompassed within Defendants' intended service territory – specifically, the Mississippi Delta region and the Mississippi River Delta region."  BCP initially named the new enterprise "Delta States Utilities" and on October 29, 2023, defendant filed an application for registration of "Delta States Utilities" on  the principal register.[5] Ultimately, however, defendant decided to proceed instead with "Delta Utilities," and in February and March, 2024, respectively, the company filed an application to register the "Delta Utilities" word mark and the composite mark on an intent-to-use basis.  The application recited the marks were for "[p]ublic utility services in the nature of natural gas distribution."

The USPTO apparently did not perceive a likelihood of confusion between the "Delta Fuel" and "Delta Utilities" marks as it published "Delta Utilities" in the Trademark Official Gazette on January 28, 2025, commencing the thirty-day

---

[5]    Also, in September 2024, BCP reserved several internet domain names, including "Delta States" and "Delta Utilities."

opposition period.[6]  See 37 C.F.R. § 201.101(c) ("The opposition must be filed within thirty days after publication (§ 2.80) of the application being opposed or within an extension of time (§ 2.102) for filing an opposition.").  Delta Fuel first discovered the proposed naming of Delta Utilities in November or December 2024 and began preparing to oppose the mark.  After the Delta Utilities mark was published on the January 28, 2025 register, Delta Fuel sought and obtained an extension to file an opposition, which it did on March 20, 2025, claiming a likelihood of confusion with its marks.  Proceedings were suspended, however, once the current litigation was filed.[7]

LAW AND ANALYSIS

Delta Fuel filed this lawsuit on June 5, 2025, alleging that defendant is in violation of the Lanham Act, as Delta Utilities' marks are confusingly similar to plaintiff's own

---

[6]    In October 2024, the USPTO issued a non-final action, refusing to register the "Delta Utilities" mark based on a likelihood of confusion with a "Delta City" mark registered by Delta City, Utah for its city water and sewer services.  The USPTO published the "Delta Utilities" proposed mark in January 2025, only after Delta Utilities had filed a response narrowing the description of its goods and services which distinguished the nature of its service from Delta City's.

[7]    See https://ttabvue.uspto.gov/ttabvue/v?pno=91297761&pty=OPP (last accessed Sept. 29, 2025); 37 CFR § 2.117 ("Whenever it shall come to the attention of the Trademark Trial and Appeal Board that a civil action ... may have a bearing on a pending case, proceedings before the Board may be suspended until termination of the civil action.").

"Delta Fuel" marks.  It filed the present motion for a
preliminary injunction a month later, on July 3, 2025.

A trademark is defined to include "any word, name, symbol,
or device or any combination thereof" used by any person "to
identify and distinguish his or her goods, including a unique
product, from those manufactured or sold by others and to
indicate the source of the goods, even if that source is
unknown."  Two Pesos, Inc. v. Taco Cabana, 505 U.S. 763, 768,
112 S. Ct. 2753, 120 L. Ed. 2d 615 (1992); 15 U.S.C. § 1127.
The Lanham Act "prohibits the use in commerce of a protected
mark, whether registered or not, that is likely to cause
confusion."  Abitron Austria GmbH v. Hetronic Int'l, Inc., 600
U.S. 412, 416, 143 S. Ct. 2522, 216 L. Ed. 2d 1013 (2023)
(citation modified); see also USPTO v. Booking.com B. V., 591
U.S. 549, 552, 140 S. Ct. 2298, 207 L. Ed. 2d 738 (2020) (Lanham
Act prohibits the use of a mark "which so resembles another's
mark as to be likely to cause confusion, or to cause mistake, or
to deceive") (citation modified).  The Act provides protection
for trademarks "in order to secure to the owner of the mark the
goodwill of his business and to protect the ability of consumers
to distinguish among competing producers."  Park 'N Fly, Inc. v.
Dollar Park & Fly, Inc., 469 U.S. 189, 198, 105 S. Ct. 658, 83
L. Ed. 2d 582 (1985); Union Nat'l Bank of Texas, Laredo, Tex. v.
Union Nat'l Bank of Texas, Austin, Tex., 909 F.2d 839, 842-43

8

(5th Cir. 1990) (identifying "two principal concerns of trademark law, both of which are seen as promoting competition: (1) to protect consumers against confusion and monopoly, and (2) to protect the investment of producers in their trade names to which goodwill may have accrued and which goodwill free-riders may attempt to appropriate by using the first producer's mark, or one that is deceptively similar.").

The Act "arms trademark owners with federal claims for relief," Booking.com B. V., 591 U.S. at 552, 140 S. Ct. 2298, including injunctive relief, where appropriate.  See 15 U.S.C. § 1116 (granting district courts power to grant injunctions, "according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office...."). Under the Act, a "senior" user, that is, the first one to use a mark, "is entitled to enjoin other 'junior' users from using the mark, or one that is deceptively similar to it, subject to limits imposed by the senior user's market and natural area of expansion."  Union Nat'l Bank of Texas, 909 F.2d at 842-43.

The standard for obtaining injunctive relief is well established:  The movant has the burden to establish: "(1) a substantial likelihood that the movant will prevail on the merits; (2) a substantial threat that irreparable harm will

result if the injunction is not granted; (3) that the threatened injury outweighs the threatened harm to the non-movant; and (4) that the granting of the preliminary injunction will not disserve the public interest." Big Tyme Invs., L.L.C. v. Edwards, 985 F.3d 456, 463–64 (5th Cir. 2021) (citation modified). A preliminary injunction is "an extraordinary remedy" which should only be granted if the plaintiff has "clearly carried the burden of persuasion on all four requirements"; if it fails to establish even one element, the motion fails. Nichols v. Alcatel USA, Inc., 532 F.3d 364, 372 (5th Cir. 2008).

Likelihood of Success on the Merits:

To prevail on the merits of a trademark infringement claim, the plaintiff "must show that it (1) possesses a valid trademark and (2) that the defendant's products create a likelihood of confusion as to source, affiliation, or sponsorship." Whirlpool Corp. v. Shenzhen Sanlida Elec. Tech. Co., Ltd, 80 F.4th 536, 543 (5th Cir. 2023). Delta Utilities does not dispute that Delta Fuel has a legally protected mark; thus, only the second element is at issue.

A "likelihood of confusion" exists when "consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." A & H Sportswear,

Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 211 (3d
Cir. 2000).  There are two "likelihood of confusion" theories --
"direct confusion" and "reverse confusion."  See SPFM, L.P. v.
Felix, Civ. No: SA-16-CV-00179-XR, 2016 WL 5854286, at *5 n.1
(W.D. Tex. Oct. 5, 2016) (direct and reverse confusion are
"really two separate theories for proving a single element
(likelihood of confusion) of the same cause of action.").

In this case, Delta Fuel has alleged both direct and
reverse confusion theories in its complaint, but it bases its
motion for a preliminary injunction on its reverse confusion
theory.  The difference in these theories is this:  In a direct,
or forward confusion case, the alleged confusion occurs "when
customers mistakenly think that the junior user's goods or
services are from the same source as or are connected with the
senior user's goods or services" and "the junior user attempts
to capitalize on the senior user's good will and established
reputation by suggesting that his product comes from the same
source as does the senior user's product."  Sands, Taylor & Wood
Co. v. Quaker Oats Co., 978 F.2d 947, 957 (7th Cir. 1992)
(citation modified).  In contrast, "[r]everse confusion occurs
when a large junior user saturates the market with a trademark
similar or identical to that of a smaller, senior user."  Id.
In that circumstance, "the senior user is injured because '[t]he
public comes to assume that the senior user's products are

11

really the junior user's or that the former has become somehow connected with the latter[, resulting in] the senior user los[ing] the value of the trademark,'" including its product identity, control over its goodwill and reputation, and its ability to enter new markets.  Id. (quoting Ameritech, Inc. v. Am. Info. Techs. Corp., 811 F.2d 960, 964 (6th Cir. 1987), cert. denied, 507 U.S. 1042, 113 S. Ct. 1879 (1993)).  See Ameritech, 811 F.2d at 964 ("The paradigm case [of reverse confusion] is that of a knowing junior user with much greater economic power who saturates the market with advertising of a confusingly similar mark, overwhelming the marketplace power and value of the senior user's mark.").  Thus, "the doctrine of reverse confusion is designed to prevent ... a larger, more powerful company usurping the business identity of a smaller senior user."  Commerce Nat'l Ins. v. Commerce Ins. Agency, Inc., 214 F.3d 432, 445 (3d Cir. 2000).

"To establish a likelihood of confusion, [the plaintiff] must show a probability of confusion, which is more than a mere possibility of confusion."  Viacom Int'l v. IJR Capital Investments, L.L.C., 891 F.3d 178, 192 (5th Cir. 2018) (citation modified).  To assess whether similar marks create a likelihood of confusion as to affiliation, sponsorship or source, the Fifth Circuit has adopted the following non-exhaustive test of eight factors, known as the "digits of confusion":  "(1) the type of

12

mark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, (7) any evidence of actual confusion," and "(8) the degree of care exercised by potential purchasers." Id. (citation modified). Courts have also considered the "commercial strength" of the junior user's mark when assessing the likelihood of confusion where the claim is based on a theory of reverse confusion. Great Am. Rest. Co. v. Domino's Pizza LLC, 348 Fed. Appx. 907, 909 (5th Cir. 2009) (citing A & H Sportswear, 237 F.3d at 230).

    "No single factor is dispositive, and a finding of a likelihood of confusion need not be supported by a majority of the factors." Bd. of Supervisors for Louisiana State Univ. Agric. & Mech. Coll. v. Smack Apparel Co., 550 F.3d 465, 478 (5th Cir. 2008). Instead, the court "should focus on the ultimate question of whether consumers are likely to be confused." Playtex Prods., Inc. v. Ga.-Pac. Corp., 390 F.3d 158, 162 (2d Cir. 2004). Moreover, as the Fifth Circuit has cautioned, "Context is critical to a likelihood-of-confusion analysis," and the court "must consider the application of each digit in light of the specific circumstances of the case; otherwise, [there is a risk of] inadvertently lowering the standard of confusion." Viacom, Int'l, 891 F.3d at 192

13

(citation modified).  The crucial issue "is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question."  Savin Corp. v. Savin Grp., 391 F.3d 439, 456 (2d Cir. 2004) (citation modified).

### Digit 1: The type of mark allegedly infringed

The type-of-mark digit refers to the strength of the senior mark.  In a typical direct confusion case, "strong marks receive the widest ambit of protection, and weak marks do not."  Future Proof Brands, L.L.C. v. Molson Coors Beverage Co., 982 F.3d 280, 289-90 (5th Cir. 2020) (citation modified).  In such cases, "[t]he more distinct and recognizable the senior user's mark, the greater the likelihood that consumers will confuse the junior user's use with that of the senior user."  Springboards To Educ., Inc. v. Houston Indep. Sch. Dist., 912 F.3d 805, 814 (5th Cir. 2019), as revised (Jan. 29, 2019), as revised (Feb. 14, 2019) (citation modified).  As explained below, the analysis is altered in reverse confusion cases.

To determine the strength of a mark in both direct and reverse confusion cases, the court considers the mark's conceptual strength, that is, "the mark's position along the distinctiveness spectrum," and its commercial strength, meaning its standing in the marketplace.  Springboards to Educ., 912

F.3d at 814 (quoting <u>Am. Rice, Inc. v. Producers Rice Mill,</u>
<u>Inc.</u>, 518 F.3d 321, 330 (5th Cir. 2008)).  <u>See</u> 4 <u>Callmann on</u>
<u>Unfair Comp., Tr. & Mono.</u> § 22:13 (4th ed.) (conceptual strength
is "the strength which a mark enjoys from the outset by virtue
of its degree of inherent distinctiveness" and commercial
strength is "the strength which is derived from usage and
promotion of the mark in the marketplace").  In reverse
confusion cases, however, while the court does consider the
plaintiff's mark's conceptual strength, the focus is on the
relative commercial strength of the parties' marks:

> [In reverse-confusion cases], the plaintiff asserts
> that the defendant—the junior but more powerful mark
> user—has been able to commercially overwhelm the
> market and saturate the public conscience with its own
> use of the mark, thereby weakening and diminishing the
> value of the mark's mark.  <u>See</u>, <u>e.g.</u>,
> <u>Checkpoint Sys.</u>, [Inc. v. Check Point Software Techs.,
> <u>Inc.</u>, 269 F.3d 270, 302-03 (3d Cir. 2001)].  Thus, in
> this situation, the conceptual strength of the
> plaintiff's mark is necessarily less important to the
> analysis.  <u>See</u> <u>Com. Nat'l Ins. Servs., Inc. v. Com.</u>
> <u>Ins. Agency, Inc.</u>, 214 F.3d 432, 444 (3d Cir. 2000)
> (noting that "it is the strength of the larger, junior
> user's mark which results in reverse confusion").
> Accordingly, when assessing the distinctiveness of the
> mark in a reverse-confusion case, the district court
> should consider both the conceptual strength of the
> plaintiff's mark and the relative commercial strength
> of the defendant's mark.  <u>See</u> <u>Visible Sys. Corp. v.</u>
> <u>Unisys Corp.</u>, 551 F.3d 65, 74 (1st Cir. 2008) ("In a
> reverse confusion case, the focus is on the relative
> strengths of the marks so as to gauge the ability of
> the junior user's mark to overcome the senior user's
> mark."); <u>Cohn v. Petsmart, Inc.</u>, 281 F.3d 837, 841
> (9th Cir. 2002) (noting that the defendant's
> "extensive advertising gives it the ability to
> overwhelm any public recognition and goodwill that

> [the plaintiff] has developed in the mark"); <u>Walter v.</u>
> <u>Mattel, Inc.</u>, 210 F.3d 1108, 1111 n.2 (9th Cir. 2000)
> ("In a reverse confusion cases ... the inquiry focuses
> on the strength of the junior mark because the issue
> is whether the junior mark is so strong as to overtake
> the senior mark."); <u>A & H Sportswear, Inc. v.</u>
> <u>Victoria's Secret Stores, Inc.</u>, 237 F.3d 198, 231 (3d
> Cir. 2000) (noting that a plaintiff is more likely to
> succeed when "pitted against a defendant with a far
> stronger mark" in reverse confusion cases); <u>Checkpoint</u>
> <u>Sys.</u>, 269 F.3d at 303 ("But in a reverse confusion
> situation, the senior user's claim may be strengthened
> by a showing that the junior user's mark is
> commercially relatively strong.  The greater relative
> strength of the junior mark allows the junior user to
> 'overwhelm' the marketplace, diminishing the value of
> the senior user's mark."); <u>see also</u> 4 McCarthy, <u>supra</u>,
> § 23:10 ("A reverse confusion case is proven only if
> the evidence shows that the junior user was able to
> swamp the reputation of the senior user with a
> relatively much larger advertising campaign.").

<u>Wreal, LLC v. Amazon.com, Inc.</u>, 38 F.4th 114, 128–29 (11th Cir.

2022).

The distinctiveness spectrum, on which conceptual strength

is measured, consists of five categories, "(1) generic, (2)

descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful,"

with the "strength of the mark, and its protection, increas[ing]

as one moves away from generic and descriptive marks toward

arbitrary marks."  <u>Future Proof Brands, L.L.C.</u>, 982 F.3d at 290

(citation modified).  Here, Delta Fuel argues that its mark is

at least suggestive, given that the USPTO registered the mark

without requiring a showing that the mark had any secondary

meaning.[8]  See Booking.com B. V., 591 U.S. at 553, 140 S. Ct.
2298 (descriptive mark may only be placed on principal register
if it has achieved secondary meaning, while suggestive,
arbitrary and fanciful marks are inherently distinct and can be
registered without secondary meaning).  Even if that is true, it
does not follow that Delta Fuel's mark is conceptually strong.
On the contrary, the Fifth Circuit has described suggestive
marks as "comparatively weak."  See Molson Coors Beverage Co.,
982 F.3d at 290 (observing that strong marks are usually
fictitious, arbitrary or fanciful, while suggestive marks are
comparatively weak, and explaining that classification of the
mark on the spectrum is not conclusive of strength "because a
descriptive mark through vigorous promotion can become a strong
mark, and an arbitrary mark that is not well known in the market
can be a weak mark.  In a word, suggestive marks are not
necessarily strong marks that favor granting an injunction.")
(citation modified).  Plaintiff has not shown that its mark has
been strengthened "by factors such as 'extensive advertising,
length of exclusive use, public recognition and uniqueness.'"
See Amicus Commc'ns, L.P. v. Hewlett-Packard Co., Inc., No.

---

[8]    It reasons on this point that "the DELTA FUEL Marks are
clearly suggestive (at a minimum) because its fuel distribution
services are wholly unrelated to a delta (a landform created at
the mouth of a river where it flows into an ocean) or the Greek
letter (Δ), which is often used in math to represent change."

CIV.A.SA-98CA1176PMA, 1999 WL 495921, at *3 (W.D. Tex. June 11, 1999) (quoting Exxon Corp. v. Texas Motor Exch. of Houston, Inc., 628 F.2d 500, 504 (5th Cir. 1980)).

A mark's standing in the marketplace, i.e., its commercial strength, "is typically shown by the duration of a trademark's use, promotion of the mark, and consumer recognition of the mark." Lettuce Entertain You Enters., Inc. v. Hotel Magdalena Joint Venture, L.L.C., No. 23-50319, 2024 WL 3274787, at *3 (5th Cir. July 2, 2024) (citing Bd. of Supervisors, 550 F.3d at 479 (duration of use); Alliance for Good Gov't v. Coalition for Better Gov't, 901 F.3d 498, 510 (5th Cir. 2018)(promotional efforts); Springboards to Educ., 912 F.3d at 815 (consumer recognition)). Notably, "[p]ervasive third-party use can undercut the strength of a mark." Id. (citing Springboards to Educ., 912 F.3d at 815 (extensive third-party use of a term throughout the market suggests that consumers will not associate the junior mark's use with the senior mark user)).

On the issue of commercial strength, the focus of Delta Fuel's argument is primarily on Delta Utilities' advertising campaign. Concerning its own commercial strength, Delta Fuel asserts that because of its longevity and established goodwill in the marketplace, its need to market itself are "minimally limited to signage on vehicles/tanks, its website and its Facebook account." In submits that, in contrast, Delta

Utilities has engaged in an "aggressive media blitz bolstered by its parent company BCP's $5 billion financial standing" which "threatens to drown out and overwhelm Delta Fuel as the senior user."

To be sure, Delta Utilities has expended substantial resources in an effort to establish itself commercially. According to Tim Poche's affidavit, since its inception in September 2023, Delta Utilities has invested over $2.2 million in its branding efforts. Yet plaintiff has offered no proof showing that Delta Utilities' efforts have yet resulted in saturation in the public awareness of its mark.

Moreover, in the court's view, any mark using "Delta" in the parties' geographic region will likely be commercially weak. As the Fifth Circuit has recognized, in evaluating whether a plaintiff's mark is strong or weak in the marketplace, the court may consider third-party usage in other industries; "third-party usage is especially relevant when it falls within the same industry or category of services." Rex Real Est. I, L.P. v. Rex Real Est. Exch., Inc., 80 F.4th 607, 621 (5th Cir. 2023) (citing Springboards To Educ., 912 F.3d at 815 (numerous third-party literacy programs using language similar or nearly identical to plaintiff's marks "suggests that consumers will not associate the junior mark's use with the senior mark user"); Xtreme Lashes, LLC v. Xtended Beauty, Inc., 576 F.3d 221, 228 (5th Cir.

2009) (widespread use of a term in commerce weighs against the strength of a mark employing that term, particularly if the term is common in the plaintiff's specific market); Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n, 651 F.2d 311, 316 (5th Cir. 1981) (significant number of other Florida financial institutions using "Sun" in their names lessened the standing of the mark)).

Here, Delta Utilities has shown that "Delta" has been registered by the USPTO in connection with over 600 marks, with ninety-nine of them in the energy sector. Further, whether registered with the USPTO or not, the use of the name "Delta" for businesses is especially prevalent in Mississippi and Louisiana. The Mississippi Secretary of State's website reflects at least 2,000 businesses that include "Delta" in their names; Louisiana's Secretary of State's website reflects hundreds of "Delta" companies, as well. See Swindol v. Aurora Flight Scis. Corp., 805 F.3d 516, 518-19 (5th Cir. 2015) (taking judicial notice of "public records contained on the Mississippi Secretary of State's and the Virginia State Corporation Commission's websites"). Not all these businesses are currently active, but the sheer number of companies that use or have used the name demonstrates the ubiquity of the name "Delta" in this area and tends to show that neither the Delta Fuel mark nor the Delta Utilities mark, especially in the absence of contrary

20

proof, is commercially strong.  See Action Inc., Inc. v.
Anheuser-Busch, Inc., 959 F. Supp. 2d 934, 944 (E.D. La. 2013,
aff'd sub nom, Action Ink, Inc. v. N.Y. Jets, LLC, 576 F. App'x
321 (5th Cir 2014) (finding that "any commercial strength enjoyed
by defendant by virtue of the 'Ultimate Fan' mark is quite weak.
Defendant has demonstrated that many other companies run
'Ultimate Fan' promotions, including in connection with contests
held among sports fans[, which] significantly lessens the
likelihood that the phrase, while known to the public, is
associated with defendant specifically."); Amicus Commc'ns, 1999
WL 495921, at *9 (W.D. Tex. June 11, 1999) (stating that
widespread use of same word in a mark dilutes the strength of
the mark, such that "[t]he ability of the mark to indicate a
single source is not strong for any user of that trade name or
mark.").

   2. Similarity of the marks

   To evaluate the similarity of the marks, the court compares
the marks' appearance, sound, and meaning.  Xtreme Lashes, 576
F.3d at 228.  See also Exxon Corp., 628 F.2d at 504 (describing
this digit as "really nothing more than a subjective eyeball
test." (quoting 2 J. McCarthy, Trademarks & Unfair Competition §
237:7 (1973)).  While "[s]imilarity of appearance is determined
on the basis of the total effect of the designation, rather than
on a comparison of individual features, courts closely analyze

the dominant features of a mark." Xtreme Lashes, LLC, 576 F.3d at 228. Confusion may result even where prospective purchasers recognize that the two designations are distinct, "if purchasers are likely to assume that the similarities in the designations indicate a connection between the two users. The relevant inquiry is whether, under the circumstances of the use, the marks are sufficiently similar that prospective purchasers are likely to believe that the two users are somehow associated." Bd. of Supervisors of LA State Univ. v. Smack Apparel Co., 438 F. Supp. 2d 653, 660 (E.D. La. 2006), aff'd sub nom. Bd. of Supervisors for Louisiana State Univ. Agric. & Mech. Coll. v. Smack Apparel Co., 550 F.3d 465 (5th Cir. 2008) (citation modified).

The word "Delta" is clearly the dominant part of both parties' word marks, but as the Fifth Circuit has held, "'the use of identical dominant words does not automatically equate to similarity between marks.'" Springboards To Educ., 912 F.3d at 815 (quoting Sensient Techs. Corp. v. SensoryEffects Flavor Co., 613 F.3d 754, 765 (8th Cir. 2010)). This is particularly so where, as here, the dominant portion of the mark is weak and the descriptive portion ("Fuel" and "Utilities," respectively) is used in advertising with like emphasis. See Sun Banks of Fla., 651 F.2d at 316 (Whether an addition is sufficient to prevent confusion in a particular instance depends upon the strength of

the main part of the mark and the distinctiveness of the
additional feature.  Where a trademark is itself weak, minor
additions may effectively negate any confusing similarity.").

This recognition comports with Delta Fuel's own statements
to the USPTO in 2009, when it attempted to register an earlier
iteration of its composite mark.  In that instance, the USPTO
initially refused registration due to the likelihood of
confusion with a "DELTABIOFUELS" mark registered to a Natchez,
Mississippi company.  To gain registration, Delta Fuel entered a
consent agreement with Deltabiofuels in which it stated that it
"distributes its products to customers primarily in the farming
sector" and further agreed that its customers were careful and
sophisticated.

In another instance, in 2018, the USPTO initially rejected
Delta Fuel's efforts to register the mark "Delta Propane,"
finding a substantial likelihood of confusion with a "Delta
Liquid Energy" mark owned by San Luis Butane Distributors, a
retail and wholesale seller and distributor of propane to
residential, agricultural and industrial markets out of
California.  To overcome the rejection, Delta Fuel entered into
a consent agreement with San Luis Butane Distributors, which the
USPTO accepted, by which the parties agreed, among other things,
that "[e]ven though both marks contain the word 'delta,' the
inclusion of the word 'propane' or 'fuel' in Delta Fuel's marks

and the inclusion of 'liquid energy' in San Luis Butane Distributor's mark serve as distinguishing features.  These distinguishing features are sufficient to prevent confusion in the marketplace."[9]

Further, applying the "eyeball test," the parties' composite marks are dissimilar in overall appearance; Delta Fuel's new composite Delta360 mark, in fact, is remarkably dissimilar.  Delta Fuel's 2019 composite mark uses blue and red uppercase font and the "A" being a delta symbol and a blue-flame-like delta symbol appearing to the left:     Its new mark has a white and orange lowercase font on a black background, with an orange chevron over the "t" and "a":

In contrast, Delta Utilities' mark has black font in upper and lower case with a tri-color, stylized "delta" symbol to the left:

3. <u>The similarity of the products</u>

"The greater the similarity between the products and services, the greater the likelihood of confusion." <u>Xtreme</u>

---

[9]    Notably, the agreement also provided that parties marketed in different geographic areas and that their products were marketed and sold to sophisticated and careful customers.

Lashes, 576 F.3d at 227 (citation modified).  Delta Fuel
characterizes the parties' goods and services as "virtually
identical" and "substantially identical."  In fact, however, the
parties' products and services are similar only in the broad
sense that both companies provide sources of energy to their
customers.  Practically, however, when viewed in context, their
products and services are clearly dissimilar.  To the point,
Delta Utilities is a rate-regulated public utility that provides
natural gas to residences and businesses in its protected
service area through pipelines.  In the areas it serves, Delta
Utilities is the only entity legally authorized to pipe natural
gas directly into homes and businesses.  Delta Fuel's business,
on the other hand, consists of selling petroleum products on the
open market, mostly to commercial concerns by means other than
underground pipelines.[10]

---

[10]     Although Delta Fuel's submissions include references to its
having residential customers, Delta360's Facebook page states,
"We've evolved from Delta Fuel to Delta 360 to offer 360°
solutions as your energy partner.  We drive *businesses* forward
with our innovative products and services—including fuel,
lubricants, propane, and reliability services nationwide."
https://www.facebook.com/deltafuelcompany/ (last visited Sept.
29, 2025) (emphasis added).  The Delta360 website also states,
"We drive *businesses* forward with our innovate energy products
and services. ..."  https://www.delta360.energy (last accessed
Sept. 29, 2025) (emphasis added).  It describes the company's
work as "energizing *industries* nationwide."  Id. (emphasis
added)

As a matter of law, Delta Fuel cannot legally provide natural gas through underground pipelines; thus, it cannot directly compete with Delta Utilities in this manner. That said, there are limited intersections where the parties could theoretically compete. Specifically, although Delta Fuel sold some portion of its propane business in 2022, Delta Fuel still sells propane, which, as noted by Adam Vegas, can be used in homes for heating, cooking and water heating, and for heating pools and spas, and for lighting and heating patios. Significantly, however, Vegas states in his affidavit that Delta Fuel has installed 150 to 2000-gallon propane tanks for subdivisions and 10,000 to 40,000-gallon propane tanks at larger industrial sites "until a natural gas utility line is installed," and conversely, has provided industrial customers with 10,000 to 40,000-gallon tanks for businesses and 150 to 2,000-gallon propane tanks "because the gas company has shut down the line to their facility," which suggests that propane is used by Delta Fuel's customers primarily when there is no available natural gas utility line. While Vegas also states that Delta Fuel sold 206,777 gallons of propane in 2024, he does not indicate who bought the propane or for what purpose. And

notably, it appears those sales would have represented less than half a percent of Delta Fuel's $291 million sales in 2024.[11]

Vegas also states in his affidavit that Delta Fuel "compete[s] directly with Delta Utilities for natural gas sales" in that it "ha[s] and [is] continuing to market compressed natural gas (CNG) and liquified natural gas (LNG) to customers." He further states that Delta Fuel has monthly *requests to quote* LNG and CNG to industrial customers. Despite these statements, these products are not currently listed among the company's products on its websites, and in its memoranda, Delta Fuel does not assert that it is currently selling LNG or CNG products; rather, it argues that the sale of these products is a natural zone of expansion for Delta Fuel. Thus, the most the court can conclude is that it is conceivable the parties could compete at some future time if Delta Fuel were to expand its business to sell LNG or CNG, which could possibly be preferred by a consumer over Delta Utilities' piped natural gas.

4. The identity of the retail outlets and purchasers

"Where the parties' respective products are sold in similar channels of trade, in similar retail locations, and to similar purchasers, there is a greater likelihood of confusion." Trojan

---

[11]    The Lanham Act protects a senior user's "natural zone of expansion," but here, it appears that Delta Fuel is intentionally contracting, rather than expanding, its presence in the propane market.

Battery Co., LLC v. Trojan EV, LLC, No. 4:21-CV-3075, 2024 WL 1331783, at *23 (S.D. Tex. Mar. 28, 2024) (citing Am. Rice, 518 F.3d at 332).  Again, Delta Utilities delivers its natural gas to residential and commercial consumers through underground pipeline distribution as the natural gas utility company servicing a protected area.  Delta Fuel, in contrast, sells and distributes its various products by means other than pipelines, primarily to business/industrial and agricultural concerns.[12]

Vegas estimates that over fifty percent of its customers are also customers of Delta Utilities, but he does not contend that the companies are *in competition* for these customers.  In fact, given the difference in the products and services which these parties provide, and the fact that Delta Utilities is the sole authorized natural gas utility for most of Delta Fuel's sales area, it is not surprising or particularly relevant that the majority of Delta Fuel customers have natural gas service provided by Delta Utilities.

    5.  The identity of the advertising media used

---

[12]    Vegas states in his affidavit that the "vast majority of its customers are small businesses and individuals," but he does not provide any further breakdown of these categories of customers or indicate which of Delta Fuel's products they purchase, in what quantities they are purchased or how the products are delivered.  Indisputably, the target market for its products and services is agricultural/business/industry, not residential or individual use.  See supra at fn. 11.

"[T]he greater the degree of overlap in the marketing approaches of the two entities, the greater the likelihood of confusion." Quantum Fitness Corp. v. Quantum LifeStyle Centers, L.L.C., 83 F. Supp. 2d 810, 827 (S.D. Tex. 1999); Network Automation, Inc. v. Advanced Sys. Concepts, Inc., 638 F.3d 1137, 1151 (9th Cir. 2011) ("Convergent marketing channels increase the likelihood of confusion."). The evidence presented is too general to conclude whether the parties' marketing approaches create a likelihood of confusion. Both Delta Fuel and Delta Utilities have websites and Facebook pages, but the content is quite different. Delta Fuel's Facebook and website are clearly aimed at marketing its products to customers. Delta Utilities' webpage does little more than recite that natural gas service previously provided by CenterPoint Energy/Entergy is now being provided by Delta Utilities, and allows customers to manage their accounts online, e.g., to pay their bills and to start, stop or transfer service. In any event, as courts have recognized, the "[u]se of the Internet for marketing ... does not alone and as a matter of law constitute overlapping marketing channels." Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1151 (9th Cir. 2002); Therma-Scan, Inc. v. Thermoscan, Inc., 295 F.3d 623, 637 (6th Cir. 2002) (quoting Entrepreneur Media).

Both companies also have signage on vehicles (and in Delta Fuel's case, tanks), and both companies sponsor local events, e.g. golf tournaments, fishing tournaments, music festivals and youth sports teams.  But none of this is particularly telling on the question of likelihood of confusion.

    6. The defendant's intent

    In a forward/direct confusion case, where the junior user is accused of trading on the senior user's goodwill, "proof that 'a mark was adopted with the intent to confuse the public ... alone may be sufficient to justify an inference of a likelihood of confusion.'"  Brennan's, Inc. v. Brennan, 512 F. Supp. 2d 559, 568 (S.D. Miss. 2007), aff'd, 289 F. App'x 706 (5th Cir. 2008) (quoting Elvis Presley Enters., 141 F.3d 188, 203 (5th Cir. 1998)).  "But in a reverse confusion case, by definition, the junior user is not attempting to capitalize on the senior user's good will and reputation; thus, it makes less sense to inquire whether the junior user adopted its mark with the intent to 'palm off' its product as that of another."  Grubhub Inc. v. Relish Labs LLC, 80 F.4th 835, 857 (7th Cir. 2023), cert. denied, 144 S. Ct. 2630, 219 L. Ed. 2d 1268 (2024) (citing Sands, Taylor & Wood Co., 978 F.2d at 961 (stating "the 'intent' factor of the likelihood of confusion analysis is essentially irrelevant in a reverse confusion case.")).  That said, "where there is evidence that the junior user deliberately intended to

push the senior user out of the market, that too would support a finding of a likelihood of confusion."  Freedom Card, Inc. v. JPMorgan Chase & Co., 432 F.3d 463, 479 (3d Cir. 2005) (citation modified).

In support of its assertion that this digit supports a likelihood of confusion, Delta Fuel relies on the facts that (1) Tim Poche, Delta Utilities' CEO since November 2024, had previously interviewed with Delta Fuels in late 2023/early 2024 for the position of CFO and thus had intimate knowledge of Delta Fuel's mark and business affairs and yet "plunged forward with its infringing brand ... in blatant disregard of Delta Fuels' trademark rights"; and (2) Delta Utilities was aware of Delta Fuel's opposition to its trademark application prior to its launch and went forward with it anyway, with a clear intent to confuse customers.  Both of these arguments are just another way of saying that BCP/Delta Utilities was aware of Delta Fuel's existence and its protected marks and yet despite this knowledge, selected the Delta Utilities mark and proceeded with its "marketing blitz" anyway.  Suffice it to say, these facts alone are clearly insufficient to create an inference that Delta Utility chose the mark to push plaintiff out of the market.[13]

---

[13]    Adam Vegas states in his affidavit that he first met Tim Porche at a marketing event in October 2023.  According to the affidavit of Sarah Porteous, by that time, BCP had already decided to use "Delta" in the new company's name, and it filed

7. <u>Evidence of actual confusion</u>

"To show actual confusion, a plaintiff may rely on anecdotal instances of consumer confusion, or consumer surveys." <u>Scott Fetzer Co. v. House of Vacuums Inc.</u>, 381 F.3d 477, 486 (5th Cir. 2004).  To demonstrate actual confusion, Delta Fuel points (1) to Vegas' affidavit, in which he states that beginning in November of 2024, Delta Fuel began receiving phone inquiries "from customers and vendors concerning [its] relationship with Delta Utilities," and (2) to fourteen phone calls its customer service department has received since April 2025 in which the callers were apparently under the impression they were contacting their natural gas utility.  The callers, for example, asked about the current balance for their "gas bills"; marking their "gas line" for construction; "gas bill" payments; disconnecting their "gas" line; and reconnecting their "gas line" due to missed payments.

In response to the motion, Delta Utilities points out that Delta Fuel has provided no evidence to show that the alleged confusion swayed a consumer's purchase.  <u>See</u> <u>Future Proof Brands</u>, 982 F.3d at 297 (plaintiff failed to show actual confusion because it "provide[d] no evidence that that confusion 'swayed consumer purchases'").  It argues that, in any event,

---

an application on October 29, 2023, for registration of "Delta States Utilities" on the principal register.

thirteen[14] mistaken calls in a three-month period without further information is so de minimis as to not be relevant.  See Amicus Commc'ns, 1999 WL 495921, at *16 (stating that evidence of actual confusion must be relatively significant and finding three instances was not significant).  Delta Utilities also presents proof that it has received no inquiries mistaking its business for that of Delta Fuel's.[15]

Contrary to Delta Utilities' assertion, Delta Fuel is not required to present proof of swayed customer purchases, nor must it present evidence of a significant number of instances of actual confusion to demonstrate a likelihood of confusion; rather, it may, as it has done here, present anecdotal evidence of confusion of its customers and those calling its customer service telephone line.  See Rex Real Est. I, 80 F.4th at 627 (explicating Fifth Circuit precedent on actual confusion and

---

[14]    Delta Utilities maintains that Delta Fuel is double-counting one call from the same person that was recorded in two separate audio files.

[15]    As Delta Fuel points out, in a reverse confusion case, where the junior mark allegedly overwhelms the senior mark, proof that the junior user has been mistaken for the senior user is not particularly relevant.  See A & H Sportswear, 237 F.3d at 233 (evidence that consumers thought the junior user's product was the senior user's product would support a direct confusion claim but not a reverse confusion claim); Lang v. Retirement Living Publ'g Co., 949 F.2d 576, 583 (2d Cir. 1991) (evidence of "actual confusion" in which the public thought the senior user was the origin of the junior user's products was irrelevant for a reverse confusion claim).

finding that plaintiff's three instances of anecdotal evidence of confusion were relevant, but that the weight of its relevance "was lessened by Plaintiff's and Defendant's high volume of business and extensive advertising."). That said, Delta Fuel has failed to provide the needed context to evaluate the relevance of its anecdotal evidence, such as the percentage of its customers who expressed confusion and the percentage of its total call volume the mistaken calls represent.[16]

8. The degree of care exercised by potential purchasers

In a reverse confusion case, customers relevant to the purchaser sophistication inquiry are those who purchase the senior user's products. See Sterling Drug, Inc. v. Bayer AG, 14 F.3d 733, 742 (2d Cir. 1994). The court determines the degree of care exercised by potential purchasers by looking to both the kind of goods or services offered and the kind of purchasers. See A & H Sportswear, 237 F.3d at 229 ("In both direct and reverse confusion, the question is whether this is the kind of product that consumers will care enough about to notice the differences, or purchase hastily with only a limited impression.").

---

[16]   Vegas' affidavit describing its own customers' and vendors' purported confusion is vague, stating only that "[i]n November and December of 2024, Delta Fuel started receiving phone inquiries from customers and vendors concerning our relationship with Delta Utilities."

Delta Fuel has twice represented to the USPTO that its "products and services are marketed and sold to careful, sophisticated customers" and that its purchasers "are careful and sophisticated consumers" who presumably can understand the difference between a regulated natural gas utility and a company that sells petroleum products on the open market. See Rex Real Est. I, 80 F.4th at 627 ("Professional and institutional" purchasers "are virtually certain to be informed, deliberative buyers.") (citation modified).

Now, in support of this motion, while conceding that its large commercial customers are sophisticated purchasers, Delta Fuel argues that "[t]he vast majority of [its] customers are small companies and individuals (purchasing inexpensive propane) that are also customers of Delta Utilities (purchasing inexpensive natural gas)." Considering the evidence, including the limited extent of the company's propane sales, Delta Fuels' apparent insinuation that "the vast majority" of its customers are propane purchasers can fairly be described as doubtful.

It also argues that its "overwhelming evidence of actual confusion from residential customers (i.e., low degree of customer care) that likely interface with both Delta Utilities and Delta Fuel in the market" tends to demonstrate a likelihood of confusion. Again, however, the actual confusion to which it evidently refers is confusion on the part of Delta Utilities'

35

customers, who had questions about their "gas" services or "gas" bills.  But as Delta Utilities has acknowledged, this digit, in a reverse confusion case, focuses on the sophistication (or lack thereof) of Delta Fuel's customers, not Delta Utilities' customers.

### Conclusion as to digits of confusion

"Likelihood of confusion is synonymous with a probability of confusion, which is more than a mere possibility of confusion."  Westchester Media v. PRL USA Holdings, Inc., 214 F.3d 658, 664 (5th Cir. 2000).  Here, there is a possibility of confusion, but having considered and weighed the digits of confusion, as discussed herein, the court concludes that Delta Fuel has failed to establish a substantial likelihood of proving anything more than a possibility of limited confusion.  For this reason alone, the motion should be denied, and indeed, the court need not even consider whether Delta Fuel has established the remaining requisites for injunctive relief.  Nevertheless, the court observes that it is not persuaded that Delta Fuel has sustained its burden as to the further requirements for obtaining an injunction.

### Irreparable harm

Under the Lanham Act, a plaintiff seeking a preliminary injunction against infringement is entitled to a rebuttable presumption of irreparable harm if it establishes a likelihood

of success on the merits.  See <u>Whirlpool Corp. v. Shenzhen</u> <u>Sanlida Elec. Tech. Co., Ltd.</u>, 80 F.4th 536, 546 (5th Cir. 2023), <u>cert. denied sub nom. Shenzen Sanlida Elec. Tech. Co.,</u> <u>Ltd. v. Whirlpool Corp.</u>, 144 S. Ct. 807, 218 L. Ed. 2d 23 (2024) (quoting 15 U.S.C. § 1116)).  As Delta Fuel has not demonstrated a likelihood of confusion, it cannot succeed on its claim for injunctive relief in any event.  But even if the court were to find that Delta Fuel had established a likelihood of confusion, the court would find that the presumption of irreparable harm is rebutted.  "Although it is often written that the loss of goodwill can be difficult to quantify and may warrant a finding of irreparable harm, it has also been said that the loss of goodwill of a business 'is usually compensable in money damages.'"  <u>Brennan's, Inc.</u>, 512 F. Supp. 2d at 573 (quoting <u>DFW</u> <u>Metro Line Services v. Southwestern Bell Tele. Co.</u>, 901 F.2d 1267, 1269 (5th Cir. 1990)).  Here, the court is not persuaded that Delta Utilities poses an imminent threat to Delta Fuel's reputation even if some slight initial confusion about their relationship may have occurred.

Two other factors militate strongly against a finding of irreparable harm.  First, although Delta Fuel still employs the "Delta Fuel" mark, it currently does so in a significantly more limited capacity.  Again, in 2024, before Delta Utilities publicly disclosed its branding, plaintiff had already "evolved

37

from Delta Fuel" to having Delta 360 as the company's primary mark.  The company has relegated the "Delta Fuel" mark to use as a sub-brand for its fuel division.

Secondly, despite having knowledge of Delta Utilities' intent to use a "Delta" mark since November or December 2024 and with full awareness by no later than February 2025 of Delta Utilities' USPTO application for use of the "Delta Utilities" mark, plaintiff delayed filing suit until June 2025 and waited another month, until July, to seek injunctive relief.  Delta Fuel did not have to wait until Delta Utilities' official launch on April 1 to seek relief from the court.[17]  See Violet Crown Cinemas, LLC v. Int'l Development Mgmt., LLC, No. 1:21-CV-01142-RP, 2022 WL 2078029, at *5 (W.D. Tex. June 9, 2022), report and recommendation adopted sub nom. Violet Crown Cinemas, LLC v. Int'l Dev. Mgmt., LLC, No. 1:21-CV-1142-RP, 2022 WL 3449499 (W.D. Tex. July 14, 2022) (quoting 5 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 30:10 (5th ed. June 2022 Update)) ("'Injunctive relief may be obtained even before defendant has sold goods or services in connection with

---

[17]    Delta Fuel chides Delta Utilities for "failing to even attempt to articulate how any swifter action by Delta Fuel would have changed Delta Utilities' cavalier brand launch, which occurred despite full knowledge of Delta Fuel's legal position." Earlier action on Delta Fuel's part could have led to the court's intervention, had it been warranted, before the April 1 launch date.

the accused mark.  Trademark infringement under Lanham Act §
43(a) can occur in the absence of the actual sale of infringing
goods or services. Pre-sales preparations such as advertising,
seeking investors, shipments and other preparatory activities
are often sufficient.'").

<u>Balance of Harms</u>

This factor requires the plaintiff to establish that its
irreparable harm is greater than the hardship that the
preliminary injunction would cause the defendant.  See <u>Valley v.
Rapides Par. Sch. Bd.</u>, 118 F.3d 1047, 1051 (5th Cir. 1997)
(balancing the harms requires the court to whether "the
threatened injury outweighs any harm that may result from the
injunction to the non-movant").  As previously stated, Delta
Fuel has not shown that it will suffer irreparable harm, only
that it is at risk of suffering some harm.  On the other hand,
Delta Utilities has shown that it would suffer significant
pecuniary and reputational harm if required to abandon its
newly-launched brand during the pendency of this litigation.[18]
On the whole, the court finds that the harm to Delta Utilities
outweighs the potential harm to Delta Fuel.

---

[18]    As stated, since September 2023, Delta Utilities has
invested over $2.2 million in its branding efforts.

<u>Public Interest</u>

Finally, and again, assuming solely for the sake of argument that Delta Fuel has demonstrated a likelihood of success on the merits, the court finds that it would not disserve the public interest to allow defendant to continue to operate under the "Delta Utilities" mark, especially since the likelihood of confusion is slight, and where it is more likely than not that an immediate cessation of use of the Delta Utilities' mark would engender confusion among Delta Utilities' customers.[19]

Based on the foregoing, it is ordered that Delta Fuel's motion for a preliminary injunction is denied.

SO ORDERED this the 29th day of September, 2025.


/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE

---

[19]    The court does not believe that an injunction would be disastrous for Delta Utilities, but it would surely prove disruptive for its customers.